UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 10 - 54533 |
| FIRST COMMUNITY VILLAGE, | Chapter 11 |
| Debtor. | Honorable C. Kathryn Preston |

## AFFIDAVIT OF DIANE TOMLINSON, CHIEF OPERATING OFFICER, IN SUPPORT OF FIRST DAY MOTIONS OF FIRST COMMUNITY VILLAGE, DEBTOR AND DEBTOR IN POSSESSION

STATE OF OHIO,
COUNTY OF FRANKLIN, SS:

I, Diane Tomlinson, of full age, being duly sworn, state that the following is true and correct to the best of my knowledge, information and belief:

1. I am the Chief Operating Officer of First Community Village ("FCV" or "Debtor"), a not for profit corporation organized under the laws of Ohio, the debtor in possession in the above-captioned case. I have been employed by FCV in this capacity since February, 2001. As such, I am familiar with the day-to-day operations, business and financial affairs of FCV.

2. On the date hereof (the "Petition Date"), FCV filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). FCV intends to continue in the possession of its assets and business as a debtor in possession. In order to enable FCV to operate effectively and to avoid the adverse effects of the chapter 11 filing, FCV requested various types of relief in "first day" applications and motion (the "First Day Motions") filed with the Court concurrently herewith.

3. I submit this affidavit (a) in support of the relief requested in the First Day Motions, and (b) to explain to the Court and other interested parties certain "background" information of FCV, and the circumstances that compelled FCV to seek relief under the Bankruptcy Code. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge and the knowledge I have acquired from those who report to me, and to whom I have previously reported, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning FCV's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this affidavit.

4. Part I of this affidavit provides background with respect to FCV's "background," including but not limited to relevant aspects of its business and capital structure. Part II sets forth the relevant facts in support of FCV's First Day Motions.

### I. BACKGROUND

5. FCV filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on April 18, 2010 (the "Petition Date"). FCV is conducting its business and is operating as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. Daily management of the property of the Debtor is conducted on its behalf by National Church Residences – Health Care, pursuant to the terms of that certain Management Agreement dated as of May 11, 2009, as amended and extended.

6. FCV is an Ohio not-for-profit corporation, originally formed in March of 1961. FCV operates and maintains a continuing care retirement facility in Upper Arlington, Ohio on a 31 acre campus owned by FCV. Prior to the initiation of the Chelsea project, the campus

consisted of three parcels of real estate improved, historically, with a 175 bed nursing center[1], referred to as the Village Healthcare Center, an 88 unit assisted living and administrative and logistical support facility, known as the Dr. Roy A. Burkhart Center, a 90 unit congregate independent living facility consisting of eleven free standing buildings, and 43 cottage apartments. Presently, FCV is home to 314 residents.

7. In March of 2005, FCV commenced an extensive redevelopment of its campus, comprised of a two phased project. The first phase ("Phase I") consisted of the demolition of four of the existing congregate independent living buildings (the South Garden) and three cottage apartments and the construction of a new 86 apartment congregate facility called The Chelsea, a 38 apartment assisted living facility (the Burkhart), 36 dementia care apartments (the Roxbury Cottages), six manor home independent living apartments and replacement ancillary and support facilities and connecting structures that provide service, physical care, and logistical support for the entire Village complex. Construction of Phase I was scheduled to be completed in December 2006. It was finally completed in March 2008. The second phase of the project ("Phase II") is comprised of the demolition of the original 88 unit assisted living/administrative building and other improvements, and the completion of the final 32 manor homes. The demolition was completed and construction of Phase II was commenced, but then halted after approximately ten percent of the work was completed.

8. To finance its contemplated redevelopment, FCV entered into a series of transactions, described generally as follows:

a. The County of Franklin, Ohio (the "Issuer"), acting by and through the County Hospital Commission of Franklin County, issued $58,705,000 aggregate principal amount

---

[1] Due to a sale of 12 skilled nursing bed licenses, FCV now has a 163 bed nursing center.

Variable Rate Health Care Facilities Revenue Refunding and Improvement Bonds, Series 2005 (The Chelsea at First Community Village Project) (the "Senior Bonds") pursuant to a Trust Indenture dated as of March 1, 2005 (the "Senior Indenture"), under which The Huntington National Bank is the Trustee (in such capacity, the "Senior Bond Trustee"). The Issuer made the proceeds of the Senior Bonds available to FCV and entered into a Lease Agreement dated as of March 1, 2005 with FCV (the "Senior Bond Lease"), having acquired the property leased to FCV through a Base Lease dated as of March 1, 2005 from FCV to the Issuer (the "Senior Base Lease"). FCV agreed under the Senior Bond Lease to pay directly to the Senior Bond Trustee, for the account of the Issuer, Basic Rent (as defined in the Senior Bond Lease). Pursuant to an Assignment of Rights Under a Base Lease and Lease Agreement dated as of March 1, 2005, the Issuer assigned to the Senior Bond Trustee, and granted a lien on, all of the Issuer's rights under the Senior Base Lease and the Senior Bond Lease (except the Unassigned Issuer's Rights, as defined in said Assignment) to secure the Issuer's performance under the Senior Indenture. Pursuant to a Guaranty Agreement dated as of March 1, 2005 (the "Senior Bond Guaranty"), FCV absolutely and unconditionally guaranteed to the Trustee, for the benefit of the holders of the Senior Bonds, (a) the full and prompt payment of the principal and premium, if any, on any Senior Bond, when and as the same shall become due, (b) the full and prompt payment of any interest on any Senior Bond, when and as the same shall become due, and (c) certain other amounts as provided in the Senior Bond Guaranty.

b. Sovereign Bank, as issuer ("Issuing Bank"), issued an irrevocable, direct-pay letter of credit dated March 30, 2005 in the stated amount of up to $59,525,262 (the "Letter of Credit") in connection with the Senior Bonds pursuant to the Construction Loan, Reimbursement and Credit Agreement dated as of March 1, 2005 (the "Pre-Petition Credit Agreement") among

FCV, Sovereign Bank as Administrative Agent (in such capacity, the "Agent"), and Sovereign Bank, HSH Nordbank AG, acting through its New York Branch, KBC Bank, N.V. and National Consumer Cooperative Bank as Lenders (together with the Issuing Bank, the "Pre-Petition Lenders"). As more particularly set forth in the Pre-Petition Credit Agreement, FCV agreed to reimburse the Issuing Bank for any amounts drawn on the Letter of Credit. The Pre-Petition Credit Agreement also provides for a construction loan (the "Construction Loan") in the aggregate principal amount of up to $23,000,000.

    c.    The Issuer also issued $1,685,000 aggregate principal amount of Health Care Facilities Subordinate Revenue Bonds, Series 2005 (First Community Village Project) (the "Subordinate Bonds") pursuant to a Trust Indenture dated as of April 1, 2005 (the "Subordinate Indenture"), under which The Huntington National Bank is the Trustee (in such capacity, the "Subordinate Bond Trustee"). The Issuer made the proceeds of the Subordinate Bonds available to FCV and entered into a Lease with FCV dated as of April 1, 2005 (the "Subordinate Bond Lease"), having acquired the property leased to FCV through a Base Lease dated as of April 1, 2005 from FCV to the Issuer (the "Subordinate Base Lease"). FCV agreed under the Subordinate Bond Lease to pay directly to the Subordinate Bond Trustee, for the account of the Issuer, Basic Rent (as defined in the Subordinate Bond Lease). Pursuant to an Assignment of Base Lease and Lease dated as of April 1, 2005, the Issuer assigned to the Subordinate Bond Trustee all of the Issuer's rights under the Subordinate Base Lease and the Subordinate Bond Lease (except the Unassigned Issuer's Rights as defined in said Assignment) to secure the Issuer's performance under the Subordinate Indenture. Pursuant to a Guaranty Agreement dated as of April 1, 2005 (the "Subordinate Bond Guaranty"), FCV absolutely and unconditionally guaranteed to the Subordinate Bond Trustee, for the benefit of the holders of the Subordinate

Bonds, (a) the full and prompt payment of the principal and premium, if any, on any Subordinate Bond, when and as the same shall become due, (b) the full and prompt payment of any interest on any Subordinate Bond, when and as the same shall become due, and (c) certain other amounts as provided in the Subordinate Bond Guaranty.

  d. The Agent has informed the Debtor that, on March 1, 2010, the Senior Bond Trustee drew the amount of $58,713,894.21 under the Letter of Credit as a result of a mandatory tender of the Senior Bonds on a credit expiration date under the Senior Indenture. The Issuing Bank honored and paid the draw and the Senior Bond Trustee's sight draft presented in connection therewith. The Debtor reimbursed the Issuing Bank only for such amount paid by the Issuing Bank to the Senior Bond Trustee in excess of the principal amount of the Senior Bonds. As a result of such draw on the Letter of Credit and pursuant to the Senior Indenture, the Issuing Bank now holds the Senior Bonds, in the principal amount equal to the amount drawn, as "bank bonds."

  e. As of the Petition Date, with respect to the Subordinate Bonds, FCV's obligations included outstanding principal in the amount of $1,685,000.00, plus accrued and unpaid interest, all secured by a subordinate lien on virtually all of FCV's assets including its real property and improvements, fixtures and materials, its personal property, contracts, and general intangibles, which lien is expressly junior and subordinate to the liens securing the Senior Bonds and Construction Loan.[2]

---

[2] The assertions made herein are for purposes of providing factual background with respect to the Subordinate Bonds, and are expressly subject to the terms and provisions of the documentation from which the references are made.

9. Although now completed, the process of construction of Phase I caused FCV considerable financial harm. Cost over-runs and construction delays have resulted in millions of dollars of increased costs for marketing, operating expenses and debt service, which have seriously jeopardized the economic viability of FCV. Numerous liens have been filed against FCV's real estate assets arising from claims made by FCV's general contractor, Weis Builders, Inc. ("Weis"), as well as claims asserted by various sub-contractors and materialmen. The aggregate face amount of these filed liens exceeds $17,500,000.[3]

10. Contributing to FCV's problems is the extensive litigation that has also mushroomed with respect to the Phase I construction disputes. A review of the records of Franklin County Common Pleas Court reflects that at least ten civil actions are pending regarding the design and/or construction of Phase I. Many of these cases arise from claims of subcontractors seeking compensation from Weis, its surety, Federal Insurance Company, the Pre-Petition Lenders and/or FCV for funds claimed to be due and owing for work and/or materials provided for Phase I. Claims have also been asserted against the project architect, Perkins-Eastman, Inc. Publicity concerning the lawsuits and liens has also negatively impacted the marketing efforts of FCV, slowing the pace of resident move-ins, which has further crippled FCV's finances.

11. The pending litigation and filed liens arising from the Phase I construction have made it impossible for FCV to re-commence construction of Phase II. FCV believes that its financial viability is inextricably tied to the completion of Phase II. FCV believes that Phase II cannot be completed until the pending litigation and liens have been adequately and appropriately addressed. To that end, FCV believes that the best forum in which to fully and

---

[3] Reference to these claims and liens is for informational purposes only. FCV reserves all rights to contest the validity of any such claims and liens.

expeditiously address these issues, and to clear a path for the initiation of Phase II construction, is this Chapter 11 proceeding.

12. In the months leading up to the initiation of this case FCV and the Pre-Petition Lenders have engaged in good faith and extensive discussions and negotiations regarding the financial reorganization of FCV in a chapter 11 proceeding. Unfortunately, the parties have been unable to agree upon a course of financial restructuring acceptable to a sufficient number of the Pre-Petition Lenders. It is the hope and expectation of the Debtor that this Chapter 11 proceeding can provide a forum in which these negotiations can be successfully concluded.

## II. SUMMARY OF FIRST DAY MOTIONS[4]

13. In order to enable FCV to operate effectively, to avoid the adverse effects of the commencement of this case and maximize the value of its assets for the benefit of its stakeholders, FCV has filed the motions described below.

14. In connection with the preparation for this bankruptcy case, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance, or the input and assistance of employees of FCV working under my supervision, as well as the input and assistance of employees of our manager, National Church Residences. I believe the information contained in the First Day Motions are accurate and correct to the best of my knowledge. As set forth more fully below, I believe that the entry of orders granting the relief requested in the First Day Motions is critical to FCV's ability to maximize and preserve the value of its estate.

---

[4] Capitalized terms used by not otherwise defined in this section shall have the meanings ascribed to such terms in the relevant First Day Motion.

**A. Application of First Community Village, Debtor and Debtor in Possession, for Entry of an Order Authorizing Employment and Retention of Allen Kuehnle Stovall & Neuman, LLP as Attorneys for the Debtor and Debtor in Possession Pursuant to §327(a) of the Bankruptcy Code (the "AKSN Retention Application")**

15. FCV will file an application to retain Allen Kuehnle Stovall & Neuman, LLP as bankruptcy counsel. I believe that approval of the retention of these professionals that have extensive experience and have become familiar with FCV's operations and business is in the best interest of FCV's estate.

**B. Motion of First Community Village, Debtor and Debtor in Possession, for the Entry of an Order Authorizing the Continued Use of its Existing (A) Bank Accounts and (B) Business Forms (the "Bank Account Motion")**

16. As reflected on Exhibit A attached to the Bank Account Motion, FCV seeks authority to maintain twelve (12) existing bank accounts maintained at three (3) different banks, namely Fifth Third Bank, PNC Bank, and Sovereign Bank (the "Bank Accounts").

17. Each of these Bank Accounts are maintained for separate and distinct business purposes. The account numbers and a brief description of each account are set forth on Exhibit A attached to the Bank Account Motion. To avoid any disruptions to the normal operation of its business and to preserve "business as usual" operations, FCV seeks authority to continue to use, at its discretion, the Bank Accounts. Allowing the Bank Accounts to be maintained with the same account numbers will best serve the interests of all parties in interest in this case. The benefit to FCV's estate will be considerable, because it will assist in accomplishing the transition to operation under chapter 11 without the costs and disruption associated with closing and opening new bank accounts.

18. FCV receives certain payments by automated deposits into certain of its Bank Accounts. FCV is concerned that its cash flow could be disrupted if it were compelled to instruct payor(s) to cease the automatic deposit to its current accounts and to, instead, set up new procedures for automatic deposits into a new account. Thus, FCV possibly could be subject to

substantial administrative burdens and delays if it is required to close the Bank Accounts and open new accounts and create an entirely new system for automatic transfers, issuing checks and paying post-petition obligations.

19. Furthermore, in the ordinary course of its business, FCV uses various checks and other business forms (collectively, the "Checks and Business Forms"). By virtue of the nature and scope of the business in which FCV is engaged and the number of suppliers with whom FCV has business relationships, it is essential for FCV to continue to use the existing Checks and Business Forms without alteration or change. To prevent unnecessary delay, confusion, and accrual of further expense to its estate, FCV requests that any requirement of adding a "Debtor in Possession" legend or number to its Checks and Business Forms be waived.

**C. Motion of First Community Village, Debtor and Debtor in Possession, for the Entry of an Order (I) Granting Authority to (A) Pay Certain Prepetition Employee Compensation, and Related Items, (B) Make Certain Payments for Which Payroll Deductions Were Made, (C) Make Prepetition Contributions and Pay Prepetition Benefits Under Employee Benefit Plans, and (D) Pay All Costs and Expenses Incident Thereto Pursuant to § 105 of the Bankruptcy Code and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Wage Motion")**

20. On the Petition Date, FCV had approximately 371 employees (the "Employees"), certain of whom were owed or had accrued entitlements to various sums for (a) wages, (b) employer portions for retirement accounts, health and dental insurance, disability coverage, and accrued vacation time; and (c) miscellaneous payroll items (collectively, the "Prepetition Compensation").

21. In addition, as of the Petition Date, FCV has made deductions from Employees' compensation to make payments on behalf of certain Employees for items in the nature of child

support, alimony, garnishments, retirement contributions, and health/dental insurance. In these instances, FCV deducts a sum of money from an Employee's compensation, and pays that amount to a third party (collectively, the "Deductions"). It is important that FCV be given authority to pay all Prepetition Compensation and the Deductions that have accrued but remain unpaid as of the Petition Date as and when such amounts become due and payable.

22. FCV also has certain employee benefit programs, including an employer sponsored retirement accounts, health and dental insurance, and disability coverage (collectively, the "Benefits"). A detailed description of the Benefits is attached to the Wage Motion as Exhibit A. Such contributions remained unpaid as of the Petition Date because certain obligations of FCV under the applicable benefit plans accrued either in whole or in part prior to the commencement of its chapter 11 case, but will not become payable in the ordinary course of FCV's business until a later date. It is important that FCV be given authority to pay all Benefits that accrued but remained unpaid as of the Petition Date as and when such amounts become due and payable.

23. FCV's estimate of the total amount of Prepetition Compensation, the Deductions and Benefits owed or accrued as of the Petition Date, not including accrued vacation benefits, is approximately $245,100, most all of which are payroll, or payroll related items. Almost all other benefits owing to employees for all pre-petition periods, have already been paid by FCV (to the various benefit providers).

24. FCV estimates that its accrued vacation benefit for all of its employees is approximately $382,000. FCV notes that it is not requesting to pay the amount of vacation benefits to its employees in the immediate future. With respect to this benefit, FCV is simply

asking for authority to continue allowing employees to take their vacation benefits in the ordinary course of business.

25.     Any delay in paying Prepetition Compensation, the Deductions, or Benefits will adversely impact FCV's relationship with its Employees and will irreparably impair the Employees' morale, dedication, confidence, and cooperation.  The Employees' support for FCV's efforts in this chapter 11 case is critical to the success of those efforts.  FCV simply cannot risk the substantial damage to its business that would inevitably attend any decline in its Employees' morale attributable to FCV's failure to timely pay wages, salaries, benefits, and other similar items.  Moreover, absent an order granting the relief requested in the Wage Motion, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, because the amounts in question are needed to enable the Employees to meet their own personal financial obligations.  Finally, without the requested relief, the stability of FCV will be undermined, perhaps irreparably, by the possibility that otherwise loyal Employees will seek other employment alternatives.

### D.     Motion of First Community Village, Debtor and Debtor in Possession, for the Entry of an Order (A) Granting Authority to Pay Certain Prepetition Trust Fund Taxes and (B) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Trust Tax Motion")

26.     In the ordinary course of its business, FCV collects certain trust fund taxes (collectively, the "Trust Fund Taxes") from its employees' pay, or otherwise collects taxes from other entities, and holds them for a period of time before remitting them to the appropriate taxing authorities (collectively, the "Taxing Authorities").  The Trust Fund Taxes include, but are not limited to, certain taxes (such as federal and state income taxes and FICA taxes) withheld from their employees' paychecks.  FCV also collects and holds for remittance a small amount of state

sales tax. FCV processes its own payroll, and remits payments to the appropriate taxing authorities, governmental agencies and other third parties. FCV requests authority to pay the Trust Fund Taxes collected prior to the Petition Date for which remittance by FCV to the applicable Taxing Authority was not yet due as of the Petition Date (collectively, the "Pre-Petition Trust Fund Taxes"), to avoid the serious disruption to its reorganization efforts that would result from the nonpayment of any such taxes, including the distractions that could result from liability for nonpayment imposed on FCV's officers, directors and other potentially responsible parties. FCV estimates the unpaid Pre-Petition Trust Fund Taxes to be in the approximate sum of $160,600 for federal, state and city employee withholdings, and $1,600 for state sales tax.

27. FCV has sufficient cash to pay promptly all of its obligations for the Pre-Petition Trust Fund Taxes in the ordinary course of its business, based on FCV's general operating revenue.

28. In the Trust Tax Motion, FCV further requests that all applicable banks and other financial institutions be authorized and directed, when requested by FCV and in FCV's sole discretion, to receive, process, honor, and pay any and all checks drawn on FCV's accounts to pay the Pre-Petition Trust Fund Taxes, whether those checks were presented prior to or after the Petition Date, and make other transfers provided that sufficient funds are available in the applicable accounts to make the payments. Each of these checks or transfers can be readily identified as relating directly to the authorized payment of the Pre-Petition Trust Fund Taxes. Accordingly, FCV believes that checks and transfers other than those relating to authorized payments will not be honored inadvertently.

### E. Motion of First Community Village, Debtor and Debtor in Possession for Interim and Final Orders Pursuant to Sections 105 and 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services to the Debtor, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures to Determine Requests for Adequate Assurance of Payment (the "Utility Motion")

29. As set forth in the Utility Motion, in the normal conduct of its business operations, FCV contracts with utility providers for the provision of, among other things, electricity and gas services to FCV's facilities. Prior to the Petition Date, FCV spent approximately $100,000 per month for utilities based on standard operations.

30. Pursuant to the Utility Motion, FCV seeks entry of interim and final orders: (i) prohibiting the Utilities from discontinuing, altering or refusing service to FCV except as set forth therein; (ii) deeming the Utilities to be adequately assured of payment on the basis of the proposed Adequate Assurance Payment; and (iii) establishing procedures for resolving requests for additional assurance of payment.

31. FCV intends to pay all post-petition obligations owed to the Utilities in a timely manner.

32. FCV cannot operate without the services provided by the Utilities, and any disruption, particularly in the FCV's electrical and gas services, and could cause significant damage to the Debtor's ongoing operations and estate, and to its ability to care for its residents and patients.

33. FCV proposes to proposes to deposit, for the benefit of the Utilities, a sum equal to one month of the FCV's estimated monthly utility consumption, calculated as an average of

twelve (12) month cost, into the Adequate Assurance Deposit Account within twenty (20) days after the Petition Date as the Adequate Assurance Deposit. The Adequate Assurance Deposit will be increased in the event that there are any Added Utilities, in an amount equal to the value of one month of services utilized by FCV (based on an average of twelve (12) month cost) from such Added Utilities.

34. The Monthly Adequate Assurance Deposit and FCV's ready access to sufficient funds to pay for post-petition services provided by the Utilities constitute sufficient Adequate Assurance for the Utilities. The Budget which is attendant to FCV's use of Cash Collateral provides for the projected Monthly Adequate Assurance Deposit over the next thirteen (13) week period.

35. I believe the Monthly Adequate Assurance Deposit and FCV's ready access to sufficient funds to pay for post-petition services provided by the Utilities constitute sufficient Adequate Assurance for the Utilities.

36. The Adequate Assurance Procedures will permit each Utility to seek additional or different Adequate Assurance beyond the Monthly Adequate Assurance Deposit Account in accordance with section 366 of the Bankruptcy Code, and will provide the Utilities with the protections afforded to them under the Bankruptcy Code, while protecting FCV and its patients and residents from any interruption in the operation of its business and the production of its product.

37. As the proposed Adequate Assurance Procedures will ensure that FCV continue to receive utility services provided by the Utilities without prejudice to the Utilities, I believe that the relief requested in this motion is necessary, appropriate, and in the best interests of FCV and its estate and creditors.

**F. Motion of Debtor, First Community Village, For Interim and Final Orders: (1) Authorizing Debtor to Use Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2; (2) Granting Adequate Protection; (3) Modifying the Automatic Stay; (4) Scheduling and Approving the Form and Method or Notice of Final Hearing; and (5) Granting Other Related Relief (the "Cash Collateral Motion")**

38. Pursuant to the Cash Collateral Motion, FCV seeks authority to use cash collateral, provide "adequate protection" to prepetition lenders and schedule a final hearing with respect to the relief requested, all as more fully described therein.

39. The Debtor intends to support ongoing operations of their business during this case through the use of Cash Collateral.

40. The reasons supporting the Debtor's request for authority to use Cash Collateral are simple yet compelling. As explained in great detail in the Cash Collateral Motion, the Debtor requires immediate use of Cash Collateral for working capital and other general corporate purposes of the Debtor.

41. In exchange for the consent to use Cash Collateral, the Debtor shall provide adequate protection of the interests in and to the Prepetition Collateral.

42. The Debtor believes that its ability to use Cash Collateral is critical to the success of this case. Without the use of Cash Collateral, the Debtor will be unable to operate its business and, therefore, unable to preserve the value of its business as a going concern pending a successful sale of its operations in this case. In short, the ultimate success of the Debtor's case hinges upon its ability to use Cash Collateral.

**G. Emergency Motion of First Community Village, Debtor and Debtor in Possession, for the Entry of an Order (i) Limiting Schedule "G" Listing for Residents, (ii) Excluding Residents from Mailing Matrix, and (iii) Modifying Notice Requirements, Including Permitting Debtor to Send Notices to Residents (the "HIPAA Privacy Motion")**

43. Pursuant to the HIPAA Privacy Motion, FCV seeks an order: (i) limiting "Schedule G" listings for FCV's residents and allowing FCV to file such portion of that schedule under "seal" (ii) modifying the Debtor's requirement to add the residents to the mailing matrix by permitting the exclusion of such residents, and (iii) modifying notice requirements to such residents so that only the Debtor (not the Bankruptcy Clerk) is required to send such residents the proposed notice attached to the HIPAA Privacy Motion as Exhibit A.

44. It is my understanding the Debtor, for some purposes, may be considered a "health care provider" as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Under HIPAA, patient records relating to the payment of health care provided to an individual are subject to strict confidentiality requirements. In light of the fact the nature of the various services provided by the Debtor is a matter of public knowledge, even listing the names and address of the Residents could possibly reveal the types of services sought. As a result, the Debtor may be restricted by law in its ability to list or otherwise identify its residents in the Schedules and the Mailing Matrix.

45. In the HIPAA Privacy Motion, the Debtor proposes to file the portion of Schedule G pertaining to the list of Residents *under seal*, to not include such Residents and/or their personal contacts or designees on the Mailing Matrix, and for the Debtor to provide the notice of the filing to such Residents and/or their personal contacts or designees, in the form as attached

thereto as Exhibit A. For the reasons set forth in the HIPAA Privacy Motion, I believe this relief is necessary as appropriate.

## CONCLUSION

In furtherance of its reorganization efforts, FCV respectfully requests that orders granting the relief requested in the First Day Motions be entered.

Dated: April 18, 2010

FIRST COMMUNITY VILLAGE

By: Diane Tomlinson
Its: Chief Operating Officer

FURTHER AFFIANT SAYETH NAUGHT.

SWORN TO BEFORE ME and subscribed in my presence this 18th day of April, 2010.

Notary Public
J. Matthew Fisher
Lifetime Commission